## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:  THE GRIND COFFEE & NOSH, LLC,                     CASE NO. 11-50011-KMS

DEBTOR                                                                              CHAPTER 11

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter came on for hearing on March 15, 2011 (the "Hearing") on the Motion for Relief of Automatic Stay ("Motion") (Dkt. No. 33) as to certain real property and improvements[1] filed by First Bank and Trust ("First Bank") and the Debtor's Response to Motion for Relief from Automatic Stay ("Response") (Dkt. No. 42 ) filed by The Grind Coffee & Nosh, LLC, the Debtor-in-Possession ("Debtor") in the above-styled Chapter 11 case.  First Bank was represented at the Hearing by Nicholas Van Wiser, and the Debtor was represented by William J. Little, Jr.  The Court determined that the Motion should be granted as to the request for adequate protection of First Bank's security interest in the Property and denied as to the request that the automatic stay be lifted, and an order to that effect was subsequently entered on March 22, 2011.  (Dkt. No. 71).  In connection with the Motion, the parties also requested that the Court determine the value of the Property serving as collateral for the indebtedness owed to First Bank and presented valuation expert witnesses and appraisal reports ranging from $250,000.00 to $565,000.00.  The issue of valuation was taken under advisement by the Court.  Having considered the pleadings, the testimony of witnesses and experts, documents and appraisal reports admitted into evidence, arguments of counsel and applicable law, the Court makes the following findings as to the valuation of the Property.

---

[1] The property and improvements are located at 934 Cedar Lake Road, Biloxi, Mississippi (the "Property").

## I.  Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(A), (B) and (G).

## II.  Facts

**A.      Procedural History**

1.        On July 9, 2008, First Bank made a loan to the Debtor in the amount of $416,000.00. The loan was secured by a deed of trust on the Property executed on the same date.  Exhibit No. 1.[2] The loan was amortized over twenty years and required a five year balloon payment.  The Debtor used the loan proceeds to construct a coffee house.

2.        On January 4, 2011, the Debtor filed a petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Mississippi.

3.        The Debtor listed First Bank as a secured creditor in the schedules that were filed on January 5, 2011, indicating a claim of $409,104.00, a secured value of $250,000.00 and an unsecured portion in the amount of $159,104.00.  (Dkt. No. 3)

4.        On February 5, 2011, First Bank filed its Motion requesting relief from the automatic stay and abandonment of the Property with an alternative request for adequate protection based on arrearages under the note, failure of the Debtor to pay taxes and alleged failure of the Debtor to maintain insurance.

5.        On February 8, 2011, First Bank filed its proof of claim in the Debtor's bankruptcy

_____

[2] Exhibit references are to Exhibits admitted into evidence at the Hearing on the Motion.

Page 2 of  17

case asserting a secured claim in the amount of $429,141.09 and listing the value of the property at $565,000.00.

6.      On February 17, 2011, the Debtor filed its Response to the Motion in which it denied that the claim of First Bank is fully secured pursuant to 11 U.S.C. § 506 and in which it pointed out that First Bank had obtained conflicting appraisals on the Property - one reflecting a value of $250,000.00 as of September 9, 2010 and one reflecting a value of $565,000.00 as of December 8, 2010.

7.      The Motion was duly noticed and set for Hearing on March 15, 2011.[3]

**B.      The Hearing**

**1.  Winfree's Appraisal and Testimony**

Wallace Martin Winfree, MAI ("Winfree") testified as an expert witness on behalf of First Bank regarding two appraisals of the Property conducted by his company, Global Valuation Services, Inc.  He stated that in his opinion the market value of the Property as of December 8, 2011, is $565,000.00, as reflected in his appraisal report admitted as Exhibit No. 3.[4]  Winfree arrived at this market value by reconciliation of an estimate under the cost approach, in which he determined an indicated value rounded to $555,000.00 consisting of a land value of $280,000.00 and an improvements value of $273,400.00, and an estimate under the sales comparison approach in which

---

[3] The Motion was initially set for hearing for February 24, 2011 (Dkt. No. 34) and was reset to be heard on March 15, 2011 (Dkt. No. 41).

[4] Traditional valuation methodologies developed in the appraisal report included the cost approach and the sales comparison approach.  Winfree determined that the income capitalization approach was inapplicable.  The Debtor's expert witness developed all three approaches in his appraisal report admitted as Exhibit No. 4.

he determined an indicated value of $565,000.00.[5]

Winfree also testified that he had performed an appraisal on the Property for First Bank at the time of execution of the construction loan in June of 2008 in which he concluded that the market value of the property as of June 6, 2008 was $250,000.00, and that the prospective value of the Property as of January 1, 2009, after the proposed construction of the coffee house, would be $620,000.00.[6]  Winfree agreed, when questioned by counsel for the Debtor, that property values started to decline on the Gulf Coast, and nationally, in September of 2008; and the decline has resulted in prices falling as much as 30%.[7]

### a.    The Cost Approach

Winfree used four land sales as the basis for his opinion that the value of the land, using the cost approach, was $280,000.00.  These sales included: (1) the October 1, 2007 sale of the subject Property to Debtor for a total sale price of $275,000.00 or $24.39 per square foot; (2) the January 24, 2007 sale of a nearby property on Cedar Lake Road purchased for Regions Bank at a total sale price of $1,210,000.00 or $23.80 per square foot; (3) the September 11, 2009 sale of property located in a shopping center on Bienville Boulevard (Hwy 90) in Ocean Springs, Mississippi for a Taco Bell restaurant, at a total sale price of $350,000.00 or $15.72 per square foot;[8] (4) and the January 28,

---

[5] Winfree based his calculations on a land area of 11,277 square feet (0.26 acres) and  a building area (the coffee house) of 1,412 square feet.

[6] The June 2008 Appraisal Report was admitted as Exhibit No. 2 at the Hearing.

[7] Anthony Butler, an account officer at First Bank, also testified to an approximate 30% decline in property values since the closing of Debtor's loan.

[8] The appraisal report listed this property as inferior to the subject Property in regard to location and size and made an upward adjustment to the $15.79 sale price per square foot resulting in an indicated value per square foot of $22.79.

2009 sale of property on Government Street in the downtown area of Ocean Springs, Mississippi, at a total sale price of $120,000.00 or $25.04 per square foot.  Exhibit No. 3 at 49-50.

To generate the indicated replacement cost for the building as part of the cost analysis methodology, Winfree used a software program from Marshall & Swift to determine a total replacement cost of $210,995.00.  After allowances for entrepreneurial incentive, costs and depreciation, Winfree arrived at a total value of improvements in the amount of $273,400.00.  By adding this amount to the $280,000.00 land value, Winfree concluded that the indicated value of the Property under the cost approach analysis was $555,000.00.  Exhibit No. 3 at 53-58.

### b.    The Sales Comparison Approach

Using the sales comparison approach, Winfree concluded that the Property had a value of $565,000.00 or $400 per square foot.  Exhibit No. 3 at 63.  Four properties were considered as comparable sales with adjustments.  These sales included: (1) the May 19, 2010 sale of a property used for a real estate office on Government Street in downtown Ocean Springs, Mississippi at a total sales price of $425,000.00 or $188.39 per square foot; (2) the July 15, 2010 sale of a storm damaged Wendy's restaurant at a total sales price of $180,000.00 or $61.58 per foot; (3) the November 16, 2006 sale of property on Highway 49 in Gulfport, Mississippi at a total sales price of $900,000.00 or $375.00 per square foot; and (4) the February 17, 2006 sale of a restaurant property on Highway 49 in Gulfport, Mississippi for a total sales price of $950,000.00 or $318.15 per square foot.  Winfree also testified about another very recent sale of property that took place in November or December of 2010 in which an old Taco Bell building in Ocean Springs, Mississippi was purchased by Krispy Kreme for renovation as a donut shop.  The $685,000 purchase price included $300,000 in renovations and $135,00 for an additional narrow strip of land to be utilized for making a drive-

through.  Winfree testified that the total purchase/renovation price for the Krispy Kreme location was around $390 per square foot and was $10 less than the number he used in his December 2010 appraisal.

### 2.    Ladner's Appraisal and Testimony

At the request of First Bank, Everett E. Ladner III, MAI, SRA ("Ladner") and his company Ladner Appraisal Group, Inc., prepared an appraisal in which the market value of the Property was estimated to be $250,000.00 as of September 9, 2010.  Exhibit No. 4.  At the Hearing, Ladner was called to testify regarding his appraisal report by the Debtor over the objection of First Bank.  In his report, Ladner utilized the cost, income and sales comparison approaches to arrive at a market value. His report included a reconciliation of values indicated by each approach to reach his final market value estimate of $250,000.00, having concluded a value by the cost approach analysis of $270,000.00, the income approach of $250,000.00 and the sales comparison approach of $240,000.00.  Exhibit No. 4 at 87.

### a.    The Cost Approach

In determining land valuation under the cost approach, Ladner included three land sales within a half-mile of the Property.  These sales included: (1) the January 7, 2009 sale of property on Popps Ferry Road[9] sold for speculative commercial use at a sales price of $171,000 or $8.53 per square foot;  (2) the June 3, 2008 sale of property on Cedar Lake Road north of Interstate 10[10] at $265,000.00 or $5.53 per square foot  for a possible food and beverage facility; and (3) the July 13,

---

[9] Popps Ferry Road intersects Cedar Lake Road just south of the Property.

[10] The Court notes that the subject Property is located in the midst of commercial growth to the south of the Interstate 10 exchange at Cedar Lake Road.

2007 sale of property on Popps Ferry Road purchased for construction of a professional office at the sales price of $275,000.00 or $5.49 per square foot.  After adjustments to the land sales for size and location of properties, and consideration of listing prices of other commercial properties in the Cedar Lake and Popps Ferry area, Ladner concluded that the land had a per square foot unit value of $8.00 for a rounded value estimate for the land of $100,000.00[11]

Ladner noted in his report that the land was purchased by the Debtor on October 1, 2007 for $225,000.00[12] or $18.48 per square foot and that additional expenses were incurred for removal of underground fuel tanks at a cost of $37,000.00 and remediation of ground contamination at $25,000.00 for a total adjusted cost for the land of $287,000.00 or $23.58 per square foot.  Ladner noted that the adjusted purchase price paid for the land by the Debtor was significantly higher than market value.  See Exhibit No. 4 at 5,52. Ladner also testified that the Debtor paid too much for the construction of the improvements on the Property.

To complete the cost analysis, Ladner utilized Marshall Evaluation Service in his determination of the cost of improvements and concluded an adjusted base cost for the commercial building of $98.76 per square foot, resulting in a replacement cost of $142,807.00 calculated on 1,446 square feet.  Ladner included additional calculations to account for a covered entry, site improvements, entrepreneurial profit, and other costs for a total cost of building and site improvements of $179,617.00.   Calculating 3% depreciation for the improvements, Ladner

---

[11] Ladner based his calculations on a land area of 12,171 of square feet at $8.00 per square foot for a total of $97,368.00 rounded to $100,000.00.

[12] The property was sold to the prior owner approximately 18 months earlier in April of 2006 for $160,000.00.

concluded that the value of the Property under the cost approach was $270,000.00 ($100,000.00 for the land and $170,000.00 for the improvements).

### b.       The Income Approach

Ladner also performed an analysis of value utilizing the income approach.  Under this approach net income is determined by estimating market rent of the property with deductions for expenses and by converting the net income into a present dollar estimate by capitalization to arrive at an indication of value.  Exhibit No. 4 at 59.  In determining his economic rent estimate, Ladner listed ten properties as comparable rentals[13] to conclude a potential annual rental income after deduction of expenses of $24,643.00 or $17.04 per square foot per year.  Applying a capitalization rate of 10.00%, Ladner concluded a present value indicated by the income approach of $250,000.00.

### c.       The Sales Comparison Approach

In estimating value by the sales comparison approach, Ladner identified four restaurant sales as comparable: (1) a September 2009 sale of a property in Picayune, Mississippi for $1,000,000 or $181.82 per square foot; (2) a December 2008 sale of a property on Bienville Boulevard in Ocean Springs, Mississippi for $1,075,000 or $130.92 per square foot; (3) a November 2006 sale of a property on Pass Road in Biloxi, Mississippi at $300,000.00 or $163.49 per square foot; and (4) a November 2005 sale of a property on Highway 49 in Saucier, Mississippi at $375,000.00 or $102.94 per square foot.  Considering these properties, Ladner's report reconciled the unit value for the Property to be $160.00 per square foot for a total value of $230,000.00.[14]

---

[13] The properties included restaurants in Mississippi in Ocean Springs, Biloxi, Madison, Pascagoula, Long Beach and also in Daphne, Alabama.  Exhibit No. 4 at 80.

[14] To determine this value, Ladner multiplied 1,446 square feet by $160.00 per square foot for a total of $231,360.00, rounded to $230,000.00.

As part of the sales comparison approach, Ladner also considered a gross income multiplier analysis based on market rent from the income approach and arrived at a value of $250,000.00. Taking the average of the two values, Ladner concluded that, under the sales comparison approach, the Property had a market value of $240,000.00.  Exhibit No. 4 at 86.

### III.  Discussion

**A.     Valuation Standards**

Valuation of property in bankruptcy proceedings may be determined in various contexts and for different purposes throughout the bankruptcy case.  See In re Immanuel, LLC, No. 10-11585, 2011 WL 938410, at *2 (Bankr. W.D. Mich. Mar. 14, 2011)(bankruptcy courts are often called upon to determine value for many reasons, and at different stages within a proceeding); Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.  P'ship), 116 F. 3d 790, 797 (5th Cir. 1997) (valuation issues arise in various contexts throughout the entire bankruptcy case, including establishing equity, allowing claims, adequate protection and plan confirmation).  "The value of collateral must be determined in light of the purpose of the valuation and of the proposed disposition or use of the collateral." In re Gauthier, No. 08-51002, 2009 WL 2226106 (Bankr. W.D. La. July 16, 2009)(citing 11 U.S.C.  506(a) and Assoc. Commercial Corp. v. Rash, 520 U.S. 953, 962, 117 S. Ct. 1879, 1885 (1997)).  In the context of the subject Motion, the parties have requested that the Court determine the value of the Property that serves as collateral for the indebtedness owed to First Bank.  The value as determined may also serve as the basis for valuing the allowed amount of First Bank's secured claim under §506 and for purposes of confirmation, given the stage of proceedings in the bankruptcy case and the proximity in time to the confirmation hearing currently

scheduled for April 21, 2011.[15]   See In re Target Graphics, Inc., No. 05-14009, 2006 WL 3691206, at *2 (Bankr. E.D. Tenn. Dec. 11, 2006)(it is a common occurrence in a chapter 11 case that hearings on confirmation and on motions for relief from the stay may be determined at the same time so that parties may bring witnesses and proof for one hearing).

> Courts are given considerable flexibility in determining valuation questions:
>
> Recognizing the pervasive influence of valuation decisions and the myriad ways in which valuation questions may arise, Congress has given the courts considerable flexibility in determining value, along with some direction. For example, where, as here, a court is required to determine a creditor's secured status, the Code provides as follows:
>
> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.*
>
> 11 U.S.C. § 506(a)(1) (emphasis added).

In re Immanuel, 2011 WL 938410, at *2; see also Fin. Sec. Assurance Inc., 116 F. 3d at 799 (the Bankruptcy Code does not prescribe a particular method of valuing collateral but leaves valuation questions to judges on case-by-case basis); 4 Collier on Bankruptcy ¶ 506.03[7], at 506-50 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010)(after determining the purpose of the valuation in light of the property's proposed use or disposition the court then selects the appropriate method of valuation).

Different valuation methodologies are utilized in determining an appropriate value for property.  In a case where the Debtor's business is operating, traditional methods have included cost,

---

[15] See Dkt. No. 65.

income and comparable sales approaches.   In re Immanuel, 2011 WL 938410, at *11(three

recognized valuation methods include cost approach, sales comparison approach and income

approach); In re Hudson, No. 208-09480, 2011 WL 1004630 (Bankr. M.D. Tenn. Mar. 16, 2011).

Valuation of property is not an exact process and courts are often greeted with conflicting

appraisal testimony, to which weight must be assigned depending upon credibility assessments.  As

one court noted:

> "Valuation outside the actual market place is inherently inexact." *Rushton v. Commissioner,* 498 F.2d 88, 95 (5th Cir.1974). *See also Boyle v. Wells ( In re Gustav Schaefer Co.),* 103 F.2d 237, 242 (6th Cir.), *cert. denied,* 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939) ("The valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals does not establish a mistake in either."); *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324, 337 (Bankr.S.D.Ohio 1992) ("Valuations of real property, like projections of income and expenses, are inherently imprecise. Opinions realistically may differ, depending upon the method of valuation used and the nature of assumptions adopted."); *In re Jones,* 5 B.R. 736, 738 (Bankr.E.D.Va.1980) ("True value is an elusive Pimpernel."). Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. *See In re Coates,* 180 B.R. 110, 112 (Bankr.D.S.C.1995) ("The valuation process is not an exact science, and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of ... [the appraisal] evidence.").

In re Smith, 267 B.R. 568, 572 (Bankr. S.D. Ohio 2001); Anderson v. Mega Lift Sys., L.L.C. (In re

Mega Sys., L.L.C.), No. 03-30190, Adv. No. 04-6085, 2007 WL 1643182, at *8 (Bankr. E.D. Tex.

June 4, 2007)(valuation of property is inherently imprecise and often involves conflicting appraisal

testimony); In re Brown, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003)(valuation of assets is not an

exact science and has inherent vagaries).

The bankruptcy court is not bound by valuation opinions or reports submitted by appraisers,

and may form its own opinion as to the value of property in bankruptcy proceedings. See Patterson

v. LJR Invs., LLC (In re Patterson), 375 B.R. 135, 144 (Bankr. E.D. Pa. 2007)[16]; see also In re

Barbieri, No. 00-22274-478, 2009 WL 5216963, at *10 (Bankr. E.D. N.Y. Dec. 29, 2009); In re

Smith, 267 B.R. at 572-74. The Court may accept an appraisal in its entirety or may choose to give

weight only to those portions of an appraisal that assist the Court in its determination.[17] See In re

Brown, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003)."[W]hen competing appraisals are submitted,

the court is required to consider portions of each to arrive at what it believes to be a realistic market

value for the property."   In re Belmont Realty Corp., 113 B.R. 118, 121 (Bankr. D.R.I. 1990).

Heightened scrutiny is appropriate when two competent appraisals are presented by qualified

appraisers stating widely divergent values. See In re Jones, No. 03-84129, 2004 WL 298612, at *3

(Bankr. C.D. Ill. Feb. 5, 2004); see also In re Gauthier, No. 08-51002, 2009 WL 2226106, at *1

(Bankr. W.D. La. July 16, 2009) (court noted that valuation was complicated by lack of reliable

---

[16]In full, the *Patterson* Court stated:

> Because of the subjective nature of the appraisal process, courts are given wide
> latitude in determining value. "A court is not bound by values determined by
> appraisals but rather may form its own opinion as to the value of the subject property
> after consideration of the appraisers' testimony and their appraisals." In re Karakas,
> 2007 WL 1307906, at *6-7 (Bankr.N.D. N.Y. May 3, 2007) ( quoting In re Richards,
> 1999 WL 14680, at *7 (Bankr.E.D.Pa. Jan. 12, 1999)).

In re Patterson, 375 B.R. at 144.

[17]For example, in *Brown*, the Court stated:

> With respect to the value of the land, the Court elects not to choose one appraisal
> over the other, that is, to accept one in its entirety and reject the other in its entirety.
> The Court believes that the better reasoned approach is to review all of the proposed
> comparables, including in its analysis only those that assist the Court in its
> determination.

In re Brown, 289 B.R. at 238.

comparable sales data). Courts must be wary of appraisals which contain unsupported but important assumptions, valuations which place property with a unique and extraordinary location on par with an ordinary lot, and comparable sales that are so dissimilar that they are of little use in supporting the opinion of value. See In re Belmont Realty Corp., 113 B.R. at 119-21.

**B.     Analysis of Value**

Having reviewed the appraisal reports admitted into evidence and the testimony of witnesses at the Hearing, the Court is not persuaded that either of the appraisal reports represents an appropriate market value of the Property, largely because of a lack of reliable comparables due in particular to the decline in market conditions in the area. The Court is also concerned about the large subjective adjustments assigned to certain listed comparables. The Court has considered portions of each appraisal to determine its own valuation of the Property in an effort to find a more realistic market value for the Property.

**1.     The Cost Approach Analysis**

Under the cost approach the Court finds the land sales used as comparables to be, for the most part, too dissimilar in terms of location and timing of sale to provide an accurate or meaningful comparison. Of all those listed by the appraisers, the Court finds the third comparable used in the Winfree report - the sale of property in Ocean Springs for a Taco Bell restaurant at the price of $15.72 per square foot - to be the most similar property in terms of its proximity to other businesses and a medical center, traffic patterns, and date of sale/valuation. The Regions Bank property, although close to the subject Property, was an older sale and a larger property. The Court finds that properties listed in the downtown area of Ocean Springs are unique due to the character of the historic coastal town and do not provide a meaningful comparable for the Property located along the

commercial area of growth off the Interstate 10 exchange along Cedar Lake Road.  The Court also does not find the sale of the subject Property to the Debtor in 2007 to be useful as a comparable sale particularly in light of the overall decline in the market since its purchase and Ladner's testimony that the price paid for the land and improvements was significantly higher than the market.  Although the properties listed in Ladner's report as comparable land sales were relatively close to the subject Property, the Court finds that they were, nevertheless, outside of the commercial area where the Property is located and therefore, do not provide a similar value for comparison.

The Court estimates the value of the land by use of the $15.72 square foot value identified in Winfree's report (the Taco Bell sale).[18]  Applying this square foot value to the 11,277 (or 12,171) square feet of land at issue yields a land value under the cost approach of approximately $177,274.00 (or $191,238.00), which will be rounded to $180,000.00.[19]

Both appraisers utilized Marshall to determine the cost of improvements on the Property to complete the cost approach analysis.  However, the Winfree valuation was significantly higher than the Ladner valuation due in large part to the differing calculations for entrepreneurial profit and "yard" improvements.  The Court accepts the value indicated by the Ladner appraisal for the value of improvements noting that Ladner based his estimate not only Marshall but also on cost bids for

---

[18]The Court notes that this price could be adjusted upward because of the alleged supremacy of location of the Debtor's property.  However, a downward adjustment would also have to be made because of the continuing decline in market values since the 2009 Taco Bell sale.  The Court finds these adjustments to be a wash.

[19]The testimony indicates that there has been a decline in property values of approximately 30% since September 2008.  In June 2008, Winfree valued the land at $255,000.  A current land value of $180,000 represents a 30% decline in value since Winfree's 2008 appraisal as opposed to the 10% increase in value for the same time period proposed by Winfree in his 2010 appraisal.  See In re Hudson, 2011 WL 1004630, at *4-5 (appraiser's failure to take into account the clear downward turn in the economy resulted in an inflated number in comparable sales analysis).

similar buildings in the Biloxi/Gulfport area.[20]  Adding the value of improvements of $170,000.00 to the land value figure in the amount of $180,000.00, the court finds that the market value of the Property using the cost approach is  $350,000.00.

### 2.    The Sales Comparison Approach Analysis

In arriving at a market value based on the sales approach analysis both appraisers identified properties that the Court finds difficult to reconcile for purposes of comparison to the subject Property.  Indeed, the testimony of the witnesses emphasized this dilemma, recognizing the general downward turn in the market and the lack of restaurant sales.  Properties located in downtown Ocean Springs, with its two-lane, tree-shaded streets and pedestrian friendly shopping, dining and arts district are not comparable to the Cedar Lake commercial district located directly off of Interstate 10.  Likewise, the damaged Wendy's property in Pascagoula is dissimilar in condition and location, and the restaurant sales listed on Highway 49 in Gulfport in 2006 were not recent enough to provide a meaningful comparison, particularly in light of the market decline since those dates of sale.  Winfree made some very large adjustments to the properties listed as comparable sales, including an adjustment of over 300% on the damaged Wendy's property.  These adjustments tend to show that the properties are not actually comparable.[21]  The properties identified in Ladner's appraisal

---

[20]Ladner testified that approximately 40% of his appraisals are pre-construction appraisals.

[21]Although a very recent sale, the Krispy Kreme property sale, not included in Winfree's report but included in his testimony, is not considered by the Court to be comparable. As is aptly evidenced by the Debtor's predicament in this case, the total price a buyer pays for property requiring construction and/or renovation of improvements may have no bearing on the actual value of the property upon completion.  The fact that Krispy Kreme was willing to pay $300,000 in renovation costs does not mean that those costs equate to a dollar for dollar increase in the value of the property upon completion.  Additionally, the price that Krispy Kreme was willing to pay for what Winfree identified as a narrow strip of land approximately 1/10th of an acre needed to support the larger parcel is inapposite.  It is generally recognized that when dealing with parcels of land, the smaller

report do not appear similar enough to the Property to provide very meaningful comparable sales given the differences in location and the age of two of the sales. Therefore, under the circumstances of this case, the Court assigns little weight to the values derived from the sales comparison approach, and limits the numbers provided therein to an outside guideline, noting one calculation as much too low and the other as much too high.

### 3. The Income Approach Analysis

The income approach analysis utilized only by Ladner resulted in an indicated value of $250,000.00. Although the Court gives some weight to the value indicated by this approach, in the Court's opinion it does not provide the best estimation of valuation given the general conditions in the market and the fact that other rental properties in the immediate area are vacant which would weigh against a probable purchase of the Property for rental income.[22] This value will also be viewed by the Court as a lower end value.

### IV.  Conclusion

Having reviewed the appraisal reports and the testimony of witnesses, and having analyzed the various methodologies utilized by the appraisers and properties listed in their reports, the Court finds that the most reasonable estimate of market value under the particular circumstances of this case and in the current market, given the lack of reliable comparable sales, is an estimate that utilizes a value established by a cost approach analysis, that figure amounting to $350,000.00. Based on this

---

the size, the higher the value. See U.S. v. Eastman, 528 F. Supp. 1184, 1186 (D. Or. 1981).

[22] Robert Wilcox, one of the principals of the Debtor, testified that three restaurants located in a shopping center about a block south of the Property have opened and closed since the Debtor opened its coffee house.

analysis, the Court concludes that the value of the collateral held as security by First Bank; and,

accordingly, the amount of First Bank's allowed secured claim, is $350,000.00.

     SO ORDERED.

                    Katharine M. Samson
                    United States Bankruptcy Judge
                    Dated:  April 4, 2011